IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 19, 2006

**STATE OF TENNESSEE v. CHARLES A. WALKER**

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40100505      Michael R. Jones, Judge**

---

**No. M2005-00165-CCA-R3-CD - Filed November 15, 2006**

---

The defendant, Charles A. Walker, was convicted by a Montgomery County jury of two counts of rape of a child, a Class A felony, and one count of aggravated sexual battery, a Class B felony, based on acts he committed against his stepdaughter, who was less than thirteen years old when the offenses occurred.  He was sentenced by the trial court to twenty years for each of the rape convictions and to eight years for the aggravated sexual battery conviction, with the rape sentences to be served concurrently to each other and the aggravated sexual battery sentence to be served consecutively to the rape sentences, for an effective sentence of twenty-eight years at 100% in the Department of Correction.  The defendant raises the following issues on appeal:  (1) whether the evidence was sufficient to sustain his convictions; (2) whether the State sufficiently proved the date of two of the offenses as set out in the bill of particulars and the verdict forms submitted to the jury; (3) whether the trial court committed reversible error by not issuing unanimity and election of offenses jury instructions; and (4) whether the totality of alleged evidentiary ruling errors warrants a new trial.  Following our review, we affirm the rape convictions but reverse and remand for a new trial on the aggravated sexual battery offense.  Additionally, we remand for entry of corrected judgments on the rape convictions to reflect that the defendant was sentenced to twenty years, rather than twenty-two, in each count.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part,**
**Reversed in Part, and Remanded**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and J.S. DANIEL, SR. J., joined.

Richard Tennent, Nashville, Tennessee (on appeal) and Robert Martin, Clarksville, Tennessee (at trial), for the appellant, Charles A. Walker.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On September 5, 2001, the Montgomery County Grand Jury returned a six-count indictment charging the defendant with four counts of rape of a child and two counts of aggravated sexual battery. The victim in all six counts was the defendant's stepdaughter, B.M.,[1] who was eleven and twelve years old when the offenses were alleged to have occurred. According to the State's proof at trial, the abuse went undetected until late June 2001, when the victim's mother discovered a sexually explicit email the defendant had sent the victim while the victim was visiting her father in Illinois. The victim's mother confronted the defendant, who confessed his actions not only to her but also to his grown daughters from a previous marriage. Ultimately, it was the defendant's own daughters, rather than the victim's mother, who reported the abuse to the police on July 2, 2001.

On May 27, 2003, the defendant proceeded to trial on all six counts of the indictment. However, at the close of the State's proof, the trial court dismissed two of the rape counts and one of the aggravated sexual battery counts, leaving the jury to deliberate on Counts One and Six, both of which charged the defendant with rape, and Count Three, which charged the defendant with aggravated sexual battery. Specifically, Count One charged the defendant with having sexually penetrated the victim on a day between May 26 and June 1, 2001; Count Three charged the defendant with forcing the victim to masturbate him on a day in January 2000; and Count Six charged the defendant with having sexually penetrated the victim "during the school spring break of 2001." Following deliberations, the jury convicted the defendant of all three offenses as charged in the indictment.

**Trial**

**State's Proof**

The victim testified that she was born on September 9, 1988, was currently in the eighth grade, and had lived for the past two years with her father and stepmother in Riverton, Illinois. She said her mother married the defendant in 1998 when she was ten years old, and from 1998 until 2001 she lived with the defendant, her mother, and her younger sister, C.M., at 315 Barkwood Court in Clarksville. The victim testified that the defendant "was making [her] have sex with him" during the time she lived at the Barkwood Court residence. She said the defendant began sometime in 1999 by touching her breasts and vagina over her clothing but then progressed to touching her private parts under her clothing. The victim stated that the inappropriate touching also involved placing her mouth on the defendant's penis and rubbing his penis with her hand. In addition, she said that the defendant penetrated her vagina with his penis on numerous occasions and in various locations throughout the house. The victim testified: "He stuck his penis in my vagina in the living room on the floor and on the couch, and then on the bathroom floor, in his bed, or the hot tub."

---

[1] It is the policy of this court to refer to minor victims of sexual abuse by their initials only.

The victim said that the intercourse occurred either in the early mornings, after her mother had already left for work and while C.M. was still asleep in her bedroom, or in the afternoons, before her mother or C.M. arrived home. She stated that her mother worked in Nashville and left for work at 5:30 a.m. and returned about 4:00 p.m. During this time period, the defendant was a carpenter and worked "[w]henever he got a call." The victim testified that when she entered middle school, she rode a different school bus from her sister, who was two years younger and in a grade below her in school. The victim said her school bus brought her home approximately thirty minutes before C.M. arrived home.

The victim was unable to remember when the defendant first penetrated her vagina but recalled that the last time occurred in the living room of the Barkwood Court residence on May 28, 2001, when she was twelve years old. She said she remembered the date because it was within a week of when her father came to pick her up for her summer visitation with him and his wife in Illinois. The victim testified that her mother was at work and her sister was asleep in her bedroom. She stated that the defendant placed a towel on the floor, laid her down on the towel, stuck his penis inside her vagina, and moved up and down until "he told [her] he had come." She said that the defendant did not use a condom and had told her that he "had some kind of surgery so he couldn't make babies." She testified that when the defendant had finished, she covered her vagina with a towel, went to the bathroom, and tossed the towel in the dirty clothes hamper.

When prompted, the victim also recalled that the defendant had penetrated her vagina with his penis in the living room of the residence during the school spring break before her father picked her up for her 2001 summer visitation. Asked what she remembered about that event, she testified: "The week of Spring Break, my Mom would be at work and he [the defendant] would wake me up about 5:30 in the morning and he would make me have intercourse with him and then my sister would be asleep in her bed." The victim said that the intercourse occurred on the living room floor but that a towel was not used. After having her memory refreshed with her prior statement, the victim also recalled that it "was in January" when the defendant first started touching her. When asked what kind of touching occurred at that time, she said that it was touching over her clothing.

The victim testified she was afraid to tell anyone about the abuse because she "thought it was [her] fault and [she] would get yelled at." She stated that her mother eventually found some sexually explicit emails that she and the defendant had been exchanging while she was visiting her father in Illinois. The victim explained that she exchanged the emails with the defendant "[b]ecause of the way he was treating [her] when [she] was with him, and [she] felt that just to make him happy, it would make him do it less and less." She said her mother deleted the emails but told her mother, the victim's maternal grandmother, about them. She said that in response, the victim's grandmother, who lived near the victim's father in Illinois, took the victim to a local park and began berating her:

> When my Mom found out, she told my Grandma and I was up with my Dad in Illinois and it was around my sister's birthday, July, and my Grandma she picked me up and she said we were going to go shopping and she took me to one of the

parks there and she was sitting there, yelling at me, telling me that I was a liar, saying it was all my fault.

The victim testified that the next adults who questioned her about the abuse were her father and stepmother, a police detective she spoke with by telephone, and an Illinois social worker her father took her to see. She said she was scared because she thought it was her fault and she would get into trouble. She also said that she and her mother did not have a good relationship and were not close.

On cross-examination, the victim acknowledged that she told Karen Morelock, the Illinois social worker who interviewed her on July 5 and July 19, 2001, that she thought she was the one who had deleted the emails, that she did not do anything with her mouth to the defendant, and that the sexual touching started in January 2000, as opposed to January 1999 as she stated in her direct examination testimony. At defense counsel's request, the victim read the following portion of her July 19 statement aloud: "I wouldn't do anything with my mouth to him, but he would lick my genital area." She agreed that the following statements in her July 19 statement were true: "It would be everyday beginning in January 2000"; "He would lick me, I had sex with him everyday for over one year"; and "[E]very once in a while, we would have sex one time in the morning and then when I would get home from school." The victim also testified, however, that her statement on direct examination that the abuse began in 1999 was true. She said the defendant first began touching her in January 1999, when she was ten years old and within a few months of his October 1998 marriage to her mother. The victim identified a letter she had written to her father and stepmother stating that she wanted to live with them when she turned thirteen, and she acknowledged that she was frustrated when her mother told her that the decision of where she would live was not solely up to her.

On redirect examination, the victim testified that she did not know how many times she had sexual contact with the defendant from the time she was ten until the last episode that occurred on May 28, 2001. She agreed that there were times when she rubbed the defendant's penis, times when he ejaculated and times when he did not, and times when she touched him with her mouth. She said she could not remember every instance of sexual contact because it did not happen every day. On re-cross examination, she testified that when she told Ms. Morelock that "[i]t would be everyday beginning in January of 2000," she was referring to the sexual touching, not intercourse. She also explained that she had told Ms. Morelock that the sexual touching began in January 2000 because she thought 2000 was the year that she was ten.

Detective Alan Charvis of the Clarksville Police Department testified that he was assigned to investigate the case on July 5, 2001, a few days after the defendant's two adult daughters, Cindy Morgan and Althena Walker, reported the defendant to the police. He said he asked Morgan to record her next conversation with the defendant and provided her with a tape recorder but did not tell her what to say. He testified he subpoenaed the records of WebTV, the internet company that provided email service to the defendant's home, but was unable to retrieve any emails between the victim and the defendant. He said that he did not find any emails during his search of the defendant's home or traces of semen in the home, despite using a light source to search the living

room carpet, couches, and other surfaces. He testified that his understanding was that there was no computer associated with WebTV and therefore no permanent record of deleted emails. On cross-examination, he acknowledged he made no attempt to search for deleted emails on the hard drive of the computer the victim had used in Illinois.

The defendant's younger daughter, twenty-four-year-old Athena Dawn Walker, testified that the defendant married the victim's mother after his first wife, the witness's mother, passed away in 1996 from brain cancer. She said that on June 30, 2001, she received a telephone call from her older sister, Cindy Morgan, which caused her to go to Morgan's house to discuss something Morgan had heard about the defendant. The next morning, the defendant telephoned her and, without mentioning specifics, began apologizing for what he had done. She said she asked the defendant, "[H]ow long has it been going on?" meaning how long had he been having sexual relations with the victim. She stated that he told her that it had been going on for six or seven months and that he was going to seek counseling.

The witness testified that after her phone conversation with the defendant she went first to her sister's home to discuss the situation further and then to the defendant's home, where she found that neither the defendant nor his wife were willing to talk with her about the issue. The next day, she telephoned the defendant and told him that she thought she needed counseling to handle his revelations. She said the defendant asked her not to see a therapist, telling her that he would be arrested if she spoke about what had happened. She testified the defendant explained to her how he was going to take care of the problem: "He told me that he was going to talk to a therapist about feelings that he was having, he wasn't going to say that he acted on them, he was just going to try to go get some counseling to try to help him[.]"

The witness testified that when she later called the defendant, he told her he had set up an appointment to see a therapist in three weeks. She said she was upset and told him that she did not want to have to wait three weeks to talk to someone. The defendant repeated that she would cause him to be arrested, and, in the background, she heard the victim's mother yelling that if she talked to a therapist it could cause her to lose custody of her daughters. The witness testified that after hanging up the phone she went directly to her sister's home, where she and her sister decided to go to the police.

On cross-examination, the witness testified that the defendant was a great father, that he never did anything sexually inappropriate to her, her sister, or her friends, and that she had never suspected him of "doing sexually inappropriate things." She acknowledged that she had stayed for a day or two in the Barkwood Court residence, her childhood home, after the defendant married the victim's mother, but the victim's mother "got frustrated" with her, and the defendant asked her to leave. She denied that this had caused a "bad falling out" between her and the defendant. She also acknowledged that the defendant never directly admitted to her that he had engaged in any sexual act with the victim.

-5-

The defendant's older daughter, thirty-one-year-old Cynthia Jean Morgan, testified that the defendant called her at the end of June 2001 to tell her that he was in trouble because he had been having sexual relations with the victim and his wife had found out about it. She said the defendant divulged "in a round-about-way" that he had been having sexual relations with the victim, but she did not ask him any detailed questions about what kind of sexual relations he meant. She stated that the defendant told her that his wife had learned about the relationship after intercepting some email and that he feared she was going to turn him in to the authorities. Morgan said that when she told the defendant she thought he deserved to be punished for what he had done, he replied that he would rather die than go to jail.

Morgan testified that she told her sister about the defendant's revelations later that day and that the following day the defendant called to ask her to stop her sister from seeing a counselor. According to Morgan, the defendant was concerned that he would be arrested if either she or her sister talked to a counselor about what he had done. Additionally, during one of her subsequent telephone conversations with the defendant, she was able to overhear the victim's mother in the background expressing her concern that she would lose custody of her daughters. Morgan said that on July 2 the defendant called her again to tell her that if either she or Athena went to see a counselor, they would deny that anything had happened. She testified that, later that same afternoon, she and Athena discussed the issue and then went to the police station to report the defendant.

Morgan testified that Detective Charvis contacted her a short time later asking if she would tape-record a conversation with the defendant. She said she agreed and on July 5, 2001, called and recorded a conversation with the defendant and his wife. The tape recording of that conversation was admitted as an exhibit and played before the jury. The transcript of the conversation, also admitted as an exhibit, reads in pertinent part:

CINDY: The other day when we were over there, I asked you if you were gonna get [the victim] help and you said, yes, you would never deny her that but if Athena and I can't even go get help, how's [the victim] gonna get help?

[DEFENDANT]: Not right now. When she get's [sic] older and ask[s] for it. I don't think she'll ask for it right now. You understand what I'm saying.

. . . .

CINDY: I don't know if a twelve year old knows to ask for help, Dad. She may not realize what your [sic] doing to her is wrong.

[DEFENDANT]: Yes, she does realize that. She does realize that.

CINDY: So she's probably gonna think it[']s okay for her to sleep with [a] 50 year old when she's 15 or 16.

[DEFENDANT]: No. No. No she's not. Cause we've already discussed it here and we're gonna sit down and talk with her.

CINDY: I just don't want her to think all this is her fault.

[DEFENDANT]: I don't either and we're gonna let her know, this is not all her fault. I know that. I don't want her to feel like it's her fault. We're gonna do it right, where she understands what was going on was wrong.

. . . .

CINDY: I just feel like at 29 years old, I need professional help to find out, after finding out that my Dad is a child molester. I can't imagine how a 12 year old would feel. I'm having a hard time.

[DEFENDANT]: Try to take some heart, Cindy, to know that I realize I made a mistake, it's never gonna happen again. It's never gonna happen again. Please try and get some conciliation in that. It will not happen again and I promise you that on my soul.

CINDY: I've just been praying a lot about this.

[DEFENDANT]: I've been praying a lot too. I will be getting back into church, somewhere. I mean I've got a lot of praying yet to do. (pause) But she is not gonna think it is alright [sic]. I mean she's gonna know what we've done is wrong. She already knows but we're gonna reaffirm that.

On cross-examination, Morgan testified that the defendant was a good and loving father to her when she was growing up and that he never did anything sexually inappropriate to her or her friends. She acknowledged she wrote in her statement to police that the defendant had "sexually touched" the victim. She also acknowledged that she would have been upset even if he had merely confessed that he was having sexual feelings toward a twelve-year-old, as opposed to sexual relations. On redirect, however, she testified that she would not have reported him to the police if she had understood him to say only that he had sexual feelings for the victim.

**Defendant's Proof**

The fifty-one-year-old defendant testified that he had lived in the eleven-hundred-square-foot Barkwood Court residence for twenty-seven years; had been married to his first wife for almost twenty-five years until she passed away on July 21, 1996, from brain cancer; had been honorably discharged from the military in 1972; and had never been in trouble before the allegations arose in the instant case. He said he had always maintained steady employment and had gotten a job at Hobby Lobby after his release from jail following his July 5, 2001, arrest in the case. The defendant

also testified that he had been a member of the Hazardous Materials Team for the Montgomery County Emergency Management Agency, delivered meals for Meals on Wheels, had been a volunteer firefighter and had taught numerous classes at the Ashland City Fire Department, and was a member of the Masonic Lodge.

The defendant testified he married the victim's mother on Halloween 1998, and she and her two daughters moved from Illinois to live with him in his Clarksville home. He stated that he had a good relationship with his wife, tried to spend as much time as he could with her and her daughters, and assumed the responsibility of seeing the girls off to school each morning after his wife had departed for work. He said that as time passed and the victim became interested in boys, he began to notice that she was starting to walk around the house wearing only a towel and to dress and undress without closing her bedroom door. He stated that when she persisted in her behavior, despite being told by both himself and his wife that she should stop, he found himself starting to have sexual thoughts about her. The defendant testified that he struggled alone with his improper thoughts for six or seven months until his wife became upset upon finding an email he had sent to the victim in which he told her that he missed her, loved her, and needed her. At that point, he said, he confessed his improper thoughts about the victim to his wife.

The defendant denied that he ever had sexual intercourse with the victim, touched her inappropriately, or exchanged sexually explicit emails with her. He also denied that he told his daughters anything other than he had been experiencing sexual feelings for the victim. The defendant explained that in his taped conversation with Morgan he had been referring to his perception that the victim had been "throwing herself" at him, which was wrong, as were the feelings that he was experiencing toward her as a result of her behavior. He further testified that he was in an automobile accident in 1990 that injured his spinal cord and ultimately rendered him impotent and that he was only able to perform sexually by injecting himself with a prescribed medication that took fifteen to twenty minutes to take effect. He said the only reason he could think of for the victim to fabricate her allegations against him was that she wanted to live with her father, instead of her mother.

On cross-examination, the defendant testified that the victim knew he had had a vasectomy because he had told her about it. He said that he believed his daughters were jealous of the attention he gave his new wife and her daughters. Although he acknowledged that he was a native English speaker, the defendant insisted that the portions of his telephone conversation with Morgan in which he stated that the things he and the victim had "done" were wrong referred to her having walked around partially nude and his having had sexual thoughts about her.

During his subsequent redirect and recross examination testimony, the defendant identified his medical records relating to the treatment of his erectile dysfunction, which were then admitted as an exhibit. The defendant acknowledged that the records reflected there was nothing wrong with his libido. He testified that he could not inject himself with the prescribed medication more than once in a twenty-four-hour period because of the danger of priapism, which was the condition of experiencing an extended erection that required surgery to correct.

Kerri Ann Walker, the victim's mother, testified she had a positive, open relationship with the victim. She described the discussions she had with the victim about puberty, adolescence, and sexuality and said that the victim knew she could talk to her about anything. She testified that the victim never complained to her about the defendant's alleged behavior and that she never saw anything to make her suspect there was anything inappropriate about the defendant's relationship with the victim. Mrs. Walker stated that she and the defendant had sexual intercourse one to two times per month and that ninety percent of the time the defendant had to inject himself with his medication in order to perform. She said that, after the allegations arose in the case, she checked and found nothing out of order in either the amount of the defendant's medication or the number of syringes in the house. She explained that this factor, combined with the victim's failure to tell anyone about the alleged abuse, led her to disbelieve the victim's allegations:

> I have not found any proof -- [the victim] never came to me and said that anything happened. She never went to anybody else. Her relationship with [the defendant] never changed. She was always happy to see him. She -- I didn't suspect a thing. I didn't find anything. When I went to count the syringes, I didn't find any medication gone and he never said to me that anything happened.

Mrs. Walker said that the defendant confessed that he had been having inappropriate feelings toward the victim after she confronted him about an email in which he told the victim that he loved and needed her. She denied that she ever deleted any "sexual" emails between the defendant and the victim. She testified that whenever the victim got into trouble, she insisted that she was going to live with her father when she turned thirteen, despite being told that a change in custody would require that the family go back to court. Mrs. Walker stated that the victim once told her that she "would do anything if she could move with her father."

On cross-examination, Mrs. Walker acknowledged that after she discovered the defendant's email, she called her mother, who was a legal secretary, and asked her to talk to the victim. She denied, however, that her mother warned her that in her experience the mother always loses custody when her child has been molested while in her custody.

Several of the defendant's friends, neighbors, and co-workers testified on the defendant's behalf, expressing their opinions as to his character and veracity. Darryl McKissack testified that he had known the defendant for almost three years, had grown to love him like a brother, and knew in his heart that he was an honest person. Judy McKissack testified she was Darryl McKissack's wife, had socialized with the defendant and his wife, and believed the defendant to be an "honest, hard-working man." Emerson Russell Dowling, Jr., the defendant's neighbor, testified that he had known the defendant for about twenty-one years and that he was "a good neighbor" and "a good friend." Mary Joyce Bumpus, another of the defendant's neighbors, testified that she had known the defendant since 1981 or 1982 and that he had always been honest with her and her husband. Bumpus said that she and her husband occasionally took the defendant's stepdaughters to church, that neither child ever disclosed to her that anything inappropriate was occurring, and that the victim always appeared to be a happy, well-adjusted child. Jim Gasaway, the defendant's supervisor at

Hobby Lobby, testified that the defendant was a very honest person. Finally, Sidney Lee VanAntwerp, one of the defendant's co-workers at Hobby Lobby, testified that she thought the defendant was very honest. However, with the exception of Gasaway, the witnesses testified on cross-examination that they would not believe the defendant if he said he had sexual feelings for a twelve-year-old girl.

Detective Alan Charvis, recalled by the defendant, acknowledged that he did not employ the services of a computer forensic expert to attempt to recover any deleted emails. He further acknowledged that he found no pornographic materials in the defendant's home and saw no signs that the carpet or couch had recently been cleaned or replaced.

The victim's younger sister, C.M., who was twelve years old at the time of trial, testified that when she lived with the defendant at the Barkwood Court residence her bedroom was the one furthest from the living room. She said the only thing she could hear from the living room when her bedroom door was open was the television set. C.M. stated that the victim never told her of any problems she was having with the defendant and that she never suspected anything improper was going on between them. On cross-examination, she testified that it was difficult for her to hear anything from the living room when her bedroom door was shut.

Anthony Scott McClure, the victim's father, testified that he was not aware of any dramatic personality changes in the victim after her mother married the defendant. He said that the victim did not tell him about the abuse; instead, he "found out from the State of Tennessee." He stated, however, that he believed the victim's allegations and that there was "[n]o question" in his mind that the defendant had violated his daughter.

Donna Kimsey, the victim's maternal grandmother, testified that she lived in Springfield, Illinois, and was a retired legal secretary for a small law firm that did not handle any child custody or domestic cases. She said she took the victim, with whom she had always had a close relationship, to a park to talk to her after receiving a phone call from the victim's mother, who was upset over the manner in which the defendant had ended an email to the victim. Kimsey stated that she asked the victim if she was having any problems with the defendant that she wanted to tell her about and that the victim got teary, bowed her head, and said only, "I can't, I can't." Kimsey denied that she yelled or tried to intimidate the victim. She testified that she never noticed any change in the victim's personality and that the victim appeared to have a good relationship with the defendant. On cross-examination, she denied that she ever suspected that the victim was being sexually abused.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his convictions, arguing that no rational juror could have found him guilty of rape of a child or aggravated sexual battery beyond a reasonable doubt. When the sufficiency of the convicting

evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant asserts that the events about which the victim testified were "medically impossible, factually improbable and ludicrous in dimension." In support, he cites, *inter alia*, the evidence relating to his erectile dysfunction, the victim's failure to disclose the alleged abuse to anyone, and the fact that no one observed any changes in the victim's personality. The State argues that there was sufficient evidence to sustain the convictions, and we agree.

### A. Rape Offenses

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2003). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body." Id. § 39-13-501(7) (2003). Although the prosecutor was not seeking such information, the victim volunteered at trial that the defendant had made her have sexual intercourse with him on numerous occasions and in various locations throughout the house. She could not recall each specific time that it occurred but was able to recount

the two separate incidents that formed the basis for Counts One and Six of the indictment, first describing in great detail the episode that occurred in the living room of the residence on May 28, 2001, and then in lesser detail the episode that occurred during the school spring break of that same year. The victim testified that in the last incident the defendant laid her down on a towel on the living room floor, put his penis in her vagina, and moved up and down until he told her he had "come." She testified that the incident that occurred during the school spring break of 2001 also took place on the living room floor but that a towel was not used during that encounter.

The defendant relies heavily on the victim's statement to Karen Morelock that she had sex with the defendant every day and sometimes twice in one day, as well as the evidence relating to his erectile dysfunction, to support his claim that the victim described events that were "medically impossible" and "ludicrous in dimension." However, as the prosecutor pointed out at trial, the defendant's own medical records state that the defendant's libido was intact and that he was able to achieve "a very strong result to small doses" of the prescribed medication. Moreover, the medical records contain only the physician's statement that he "discussed the possible complication of priapism" with the defendant; there is nothing in the records to show that the defendant ever experienced that complication or that his physician warned him against injecting himself more than once in a twenty-four-hour period. Furthermore, the victim explained in her testimony that she had been referring to sexual touching, not sexual intercourse, when she told Morelock that it happened every day.

The defendant also argues that it was "factually improbable" for the defendant to have had daily sex with the victim in the living room without the victim's sister or mother noticing anything amiss. The victim, however, testified that the morning intercourse occurred while her sister was asleep, and C.M. testified that it was difficult for her to hear much from the living room when her bedroom door was closed. The victim also testified that the episodes occurred when her mother was absent from home.

The victim's testimony about the abuse was corroborated, in part, by Cindy Morgan and Athena Walker, each of whom understood the defendant to have confessed that he had sexual relations with the victim. In addition, the jury heard the tape recording of the defendant's conversation with Morgan, in which he never objected when she referred to him as a child molester or stated that the victim might think it was all right for her to sleep with a fifty-year-old man when she was fifteen or sixteen. In sum, there was ample proof presented from which a rational trier of fact could find the defendant guilty of both counts of rape beyond a reasonable doubt.

### B. Aggravated Sexual Battery Offense

We also conclude that the evidence was sufficient to establish the offense of aggravated sexual battery. Aggravated sexual battery is the "unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: [t]he victim is less than thirteen (13) years of age." Id. § 39-13-504(a)(4) (2003). "Sexual contact" is defined as "the intentional touching of the victim's, the defendant's, or any other person's intimate

parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6). The evidence at trial, which included proof that the victim was less than thirteen years old when the sexual touching occurred and that the touching involved, among other things, the victim rubbing the defendant's penis with her hand, was sufficient to satisfy the elements of the offense of aggravated sexual battery.

## II. Date of Offenses

The defendant's second and third issues are interrelated. In his second issue, he contends that the evidence was insufficient to sustain the dates of the offenses in Count Three, which charged him with the January 2000 aggravated sexual battery of the victim, and in Count Six, which charged him with the rape of the victim during the 2001 school spring break. The defendant asserts that it was unclear from the victim's testimony whether she was referring to the 2001 spring break, as opposed to a previous year's spring break, when testifying about the rape that formed the basis for Count Six and that she never specifically testified about any masturbation that took place in January 1999 or January 2000. He acknowledges that the date was not an essential element of either offense but argues that he should be granted a new trial on those offenses because the proof did not correspond to the dates the State chose for the offenses, there was evidence of similar offenses occurring on other dates, and the State failed to make a proper election of the offenses. The defendant further argues that the trial court's failure to give an enhanced unanimity instruction, combined with the court's general instruction that the jury must find that the offenses occurred prior to the returning of the indictment, increased the danger that the jury arrived at a "patchwork verdict," in which some jurors considered one set of facts while others considered a different set of facts when rendering the verdicts. The State argues that the evidence was sufficient to sustain the dates of the offenses.

We agree with the State that the proof presented at trial was sufficient to establish that the rape in Count Six occurred during the 2001 spring break, as set forth in the indictment, the bill of particulars, and the verdict forms submitted to the jury. The victim's testimony about the spring break rape occurred after she had described the May 28, 2001, rape, and was prompted by the prosecutor's question of whether she recalled anything having happened "maybe a couple of months before [her] Dad came to pick [her] up." Thus, given the context in which her testimony about the rape occurred, the jury could have reasonably inferred that the victim was referring to the 2001 spring break when describing the rape in Count Six.

We disagree, however, with the State's assertion that the evidence was sufficient to establish that the aggravated sexual battery occurred in January 2000. In support of its assertion, the State cites the victim's direct examination testimony that the sexual touching began in January, along with her cross-examination testimony that she had been referring to "[t]he sexual touching," and not intercourse, when she told the Illinois social worker that "[i]t would be everyday beginning in January of 2000." However, a close reading of the transcript reveals that the victim never stated that the sexual touching that took place in January included her masturbating the defendant. On direct examination, the following exchange occurred:

Q. Now, was there any other time, and I think you may have mentioned 1999, where there was touching between yourself and [the defendant]?

A. Yes.

Q. Can you recall when that was?

A. I don't remember when.

Q. Do you remember what kind of touching it was that occurred?

A. Yes.

Q. What was it?

A. [The defendant] would take my hand and make me rub his penis.

Q. I think we have already talked about the word ejaculate, do you know whether he came or not?

A. At first, when I first began doing it, no. And then he did.

Q. Do you have any idea when it occurred that you would have done this act?

A. I don't remember.

After having her memory refreshed with her prior statement, the victim recalled that it was in January when the touching began, but she never testified that the touching included her rubbing the defendant's penis. Instead, she appeared to indicate that the January touching involved only the defendant's touching her over her clothing:

Q What date do you now remember having read that?

A I remember that it was in January.

Q You are going to have to tell the ladies and gentlemen of the jury, what was in January?

A When he first started touching me.

Q Now, you probably have already said, but just to make sure that us adult minds are on the same wave length, touched you where?

A    My vagina.

Q    And I think we talked earlier about over or under your clothing?

A    Yes.

Q    Which time was it that it happened in January?

A    Over.

Still later, the victim agreed that there were times she rubbed the defendant's penis, times he ejaculated and times he did not, and times when she performed oral sex on him.  Thus, the proof at trial did not establish that the offense occurred on the date listed in the indictment, the bill of particulars, and the verdict forms.  Ordinarily, a variance between a date in an indictment and the proof presented at trial would not be material.  However, in this case, proof was presented of numerous acts of masturbation without any testimony from the victim that distinguished one act from others.  Furthermore, the State's only election consisted of its identification of the date and nature of the offense in the verdict forms, and the trial court apparently did not give any enhanced unanimity or election of offenses instructions.  For those reasons, we must reverse Count Three of the indictment and remand for a new trial on that count, as we explain further in the next section of this opinion.

### III.  Inadequate Jury Instructions

In his third issue, the defendant contends that the trial court committed reversible error by not giving specific unanimity and election of offenses jury instructions.  The State argues that the defendant has waived the issue by his failure to request the specific instructions or to object to the trial court's proposed instructions.  However, although the defendant did not request the specific jury instructions and expressed satisfaction with the trial court's proposed instructions at trial, he raised the issue of the State's failure to elect offenses and the lack of an enhanced unanimity instruction in his motion for a new trial.  Moreover, a defendant has a fundamental constitutional right to a unanimous verdict, and is therefore entitled to an election and an unanimity instruction even when he has not requested them.  See Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973).  Accordingly, this issue is not waived.

As an initial matter, we note that the transcript of the trial judge's actual instructions to the jury is not included in the record before this court.  Instead, all we have before us is the typewritten jury instructions.  One of the elementary duties of a defendant is to prepare an adequate record in order to allow meaningful review on appeal.  See Tenn. R. App. P. 24(b); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983).  When the record is incomplete and does not contain information relevant to an issue presented for review, we are ordinarily precluded from reviewing the issue.  State v. Gibson, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997); State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).  Nonetheless, neither party disputes the accuracy of the typewritten jury

instructions, and we will therefore assume that they correspond to the trial court's actual instructions at trial.

Where there is evidence at trial that the defendant has committed multiple offenses against the victim, the doctrine of election requires the State to elect the facts upon which it is relying to establish each charged offense. State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Id. at 631 (citation omitted). Our supreme court expressed the rule regarding election of offenses in cases involving evidence of separate incidents of sexual assault:

> We hold that it was the duty of the trial judge to require the State, at the close of its proof-in-chief, to elect the particular offense of carnal knowledge upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense.

Burlison, 501 S.W.2d at 804. And, as this court has previously noted:

> [I]n cases involving evidence which shows a real potential that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, each of which separately showing the commission of an offense, the trial court must augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts. The assessment of this potential would involve consideration of the allegations made and the statutory offense charged, as well as the actual evidence presented.

State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991).

In the verdict forms supplied to the jury, the offenses were identified by date and nature of the offense. The verdict forms stated, in pertinent part: "Count One: (26 May 2001 – 1 June 2001)"; "Count Three: (January 2000 – Masturbate)"; and "Count Six: (School Spring Break 2001)." The defendant concedes that the dates set forth in the jury verdict forms constituted "a binding election" but argues that "a much more explicit instruction . . . that communicated the importance of those dates to the jury was required."

We agree with the defendant that an election of offenses and enhanced unanimity instruction should have been given. However, we find the error to have been harmless with respect to Counts One and Six. Although the victim testified that she had had sexual intercourse with the defendant on numerous different occasions and locations during the time she lived with him at the Barkwood Court residence, she described only two incidents in detail: the May 28, 2001, rape in the living room and the second rape that occurred in the living room during the school spring break of 2001. There was, therefore, no danger that the jurors might have been considering different offenses when deliberating on those counts. Such a danger did exist, however, with respect to the aggravated sexual

battery count of the indictment. That offense was narrowed as to time and act, but the proof at trial did not correspond to the time frame selected and there was evidence of more than one occasion on which the act of masturbation occurred.

Our supreme court addressed a similar situation in State v. Brown, 992 S.W.2d 389 (Tenn. 1999), in which a child rape victim testified about multiple instances of penetration, the State did not elicit identifying details from the victim about the single count for which the defendant was on trial, and the proof did not correspond to the time frame the State selected for the offense:

> The prosecution did not attempt to clarify the victim's testimony, or clarify the conflicts in the testimony, either by eliciting additional details or by relating the timing of the abuse to some other occasion in the victim's life. Moreover, instead of relying upon the few details that were elicited, for example, an incident that occurred on a Friday when it was warm, to make the election, the prosecution did not elect a specific offense but simply narrowed the time-frame of the charged offense from the period alleged in the indictment (March 1, 1993, to September 30, 1993) to an offense occurring between Easter, April 11, 1993, and June 30, 1993. This time-frame limitation was not an election and failed to ensure that the jury would focus on a single offense.

> Moreover, as the State now concedes on appeal, the deficiency in the election at trial was further compounded by the fact that the time-frame chosen by the prosecutor was simply inaccurate. A close reading of the testimony reveals that the victim testified that acts of digital penetration were committed by Brown in Brown's trailer *prior* to the occasion on which Brown took the photographs of the victim. The victim's mother testified that she saw the photograph of the victim prior to Easter, April 11, 1993. The State nonetheless "elected" an offense between April 11, 1993 and June 30, 1993 – a period for which the victim described no specific offenses. Accordingly, even had the elected offense been sufficiently detailed, the evidence did not support the time-frame selected by the State.

Id. at 392 (footnote omitted).

In the bill of particulars, the State identified Count Three as a masturbation that occurred in the living room of the residence in January 2000, while the defendant had his clothes on and his zipper open. The State was unable, however, to elicit those identifying details from the victim at trial, and her testimony did not establish that any masturbation occurred in January 2000. Accordingly, we must reverse the defendant's conviction for aggravated sexual battery and remand for a new trial on that offense.

## IV. Alleged Errors in Evidentiary Rulings

As his final issue, the defendant contends that the cumulative effect of the trial court's alleged errors in evidentiary rulings requires that he be granted a new trial on all offenses. Specifically, he argues that the trial court erred in allowing the victim to testify about the defendant's prior bad acts, in admitting into evidence a photograph of the victim when she was ten years old, in limiting the defendant's character evidence to evidence of his character for truthfulness, in precluding the defendant from using two letters the victim received from young boys to impeach the victim's credibility, and in preventing the defendant from introducing an email from the victim's stepmother to the victim's mother to impeach the credibility of the victim's father. The State argues, among other things, that the errors alleged by the defendant do not warrant a new trial. We agree with the State.

Rulings on the admissibility of evidence based on its relevance are entrusted to the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. State v. Thomas, 158 S.W.3d 361, 395 (Tenn.), cert. denied, __ U.S. __, 126 S. Ct. 125, 163 L. Ed. 2d 131 (2005). "'[A]n appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Id. (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

## A. Evidence of Prior Bad Acts

The defendant argues that it was error for the trial court to permit the victim to testify about other sex acts, including oral sex, which were not included in the indictment or bill of particulars and which occurred prior to the first date alleged in the indictment. The State responds by arguing that the defendant has waived the issue by failing to object at trial. The State asserts that the defendant's failure to object was the result of his trial strategy of attempting to impeach the victim's credibility with the inconsistencies between her trial testimony and previous statements about the abuse.

Tennessee Rule of Appellate Procedure 36(a) provides that relief is not required for a party who fails to take reasonably available actions to prevent or nullify an error at trial. The record reveals that defense counsel not only failed to object to the victim's brief references to other sex acts during direct examination, but also deliberately elicited additional and more detailed testimony about those acts on cross-examination in his effort to point out the inconsistencies and improbabilities in the victim's accounts to the Illinois social worker. Thus, we agree with the State that the defendant is not entitled to relief on the basis of this claim.

## B. Photograph of Victim

The defendant contends that the trial court erred by allowing into evidence a photograph of the victim taken when she was ten years old. He argues that the photograph was irrelevant to any issue at trial and was prejudicial to his case, as it showed the jury that the victim was "a cute, little

girl at age ten." The State alternately argues that the photograph was relevant to show the victim's general appearance at the time the abuse began and that the admission of the photograph was harmless error.

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000), cert. denied, 531 U.S. 1082, 121 S. Ct. 786, 148 L. Ed. 2d 682 (2001). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998), cert. denied, 526 U.S. 1071, 119 S. Ct. 1467, 143 L. Ed. 2d 551 (1999); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

The trial court overruled the defendant's objection to the photograph without explaining its ruling. However, we agree with the State that the photograph was relevant to show the jury a more accurate depiction of the victim's appearance at the time the abuse was occurring than the appearance she presented at trial. By the time of trial, almost two years had passed since the last instance of abuse and the victim, who was almost fifteen years old, was a teenager rather than the elementary school-aged child she had been when the abuse occurred. Additionally, the victim testified at trial that she was ten years old when the defendant married her mother and that the abuse began within a few months of that time. Thus, we conclude that the trial court did not abuse its discretion in admitting the photograph.

### C. Limiting of Character Evidence

The defendant next argues that the trial court erred by precluding the defense witnesses from expressing their opinions as to his character with children. The State concedes that the trial court erred in limiting the character witnesses' testimony to their opinions as to the defendant's character for truthfulness but contends that the error was harmless in light of the entire record. We agree with the State.

After eliciting testimony from the first character witness, Darryl McKissack, about his close relationship with the defendant, defense counsel sought his opinion about whether he would have confidence in having the defendant around his children or grandchildren. The State immediately objected on the grounds of relevance and the trial court sustained the objection, ruling that the testimony defense counsel sought to elicit was "totally irrelevant," as McKissack was present only "as a character witness, as to truthfulness" and could not otherwise render his opinion.

Tennessee Rule of Evidence 404(a)(1) provides the following exception to the general rule prohibiting character evidence: "Character of Accused – Evidence of a pertinent character trait

offered by the accused or by the prosecution to rebut the same." As explained by Neil P. Cohen et al., in <u>Tennessee Law of Evidence</u>, § 4.04[4][a], [b] (5th ed. 2005):

One important exception to the general rule barring character evidence is provided by Tennessee Rule 404(a)(1), which permits the accused in a criminal case to "open the door" by introducing evidence of his or her own "pertinent" character trait. Obviously, this proof will stress positive facets of the defendant's character. Until the defendant takes this step, the government is barred from introducing evidence of the defendant's bad character to prove the defendant acted in conformity with that character.

The underlying theory behind the rule is that negative character evidence is too prejudicial to be used routinely by the prosecution. However, the theory continues, if the defendant wants to have the trier of fact consider the defendant's character in determining whether the defendant did a certain act, courts should permit this in order to allow the defense to put on its best case. . . .

Evidence under Rule 404(a)(1) is limited to proof of a *pertinent* character trait. What is pertinent will vary according to the nature of the case. In an embezzlement case, for example, the trait of honesty is clearly pertinent on the issue whether the accused falsified business records, but the traits of violence or kindness are probably not pertinent. Sometimes the pertinent character trait is quite general. In a federal drug possession case, defendant's character as a "law-abiding person" was deemed pertinent.

Tennessee Rule of Evidence 405(a) provides that "[i]n all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion."

Because the defendant was on trial for child rape and aggravated sexual battery of a child, we disagree with the trial court's conclusion that McKissack's opinion with respect to the defendant's character with children was irrelevant. However, we agree with the State that the trial court's preclusion of the testimony was harmless error. <u>See</u> Tenn. R. Crim. P. 52(a) ("No judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits."). As the State points out, McKissack was able to convey his opinion regarding the defendant's trustworthiness with children on cross-examination when he testified that he would not believe the defendant if he said he had molested his stepdaughter because he knew the defendant was "not that type of person." Mrs. McKissack also testified that, based on what she knew of the defendant, she "wouldn't think that he would be that kind of person." Similarly, other defense witnesses, by testifying that they would not believe the defendant if he told them he had sexual feelings for a child, were able to convey their opinions as to the defendant's character with children.

## D. Preclusion of Letters

The defendant next contends that the trial court erred by precluding him from impeaching the victim's credibility with two letters she had received from young boys. When defense counsel questioned her about her relationship with her mother, the victim denied that her mother ever talked to her about puberty or boys. At that point, defense counsel sought to confront the victim with the letters, asking the victim whether her mother had ever questioned her about letters she had discovered to the victim from "some little boy." The State objected to the introduction of the letters and the trial court sustained the objection, citing the collateral fact rule. The trial court's ruling states, in pertinent part:

> But asking a first question to set up the witness so that you can cross examine or ask a second question, when neither of which is really relevant. That is what I see at this point. This letter is clearly not relevant to any question that is being asked in this particular case. It is not relevant as to whether or not any criminal actions occurred. And it certainly is expressing an opinion, by basically an unknown person at this time.

The defendant now challenges that ruling, arguing that "this issue was far from collateral" because if the victim's mother had "discussed these very personal letters with [the victim], then it would cast doubt on [the victim's] contention that she couldn't talk to her mother about such things, including being raped." The State argues that the trial court properly precluded the letters, as neither their content, nor the fact that the victim had received them, was relevant to any issue at trial. We again agree with the State.

Our supreme court has explained that the "collateral fact rule" precludes in certain cases the impeachment of a witness by evidence that is only relevant because it contradicts the witness's testimony in court:

> The collateral fact rule is essentially a rule of relevancy. Under Rule 402 of the Tennessee Rules of Evidence, "[e]vidence which is not relevant is not admissible." Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Rules 402 and 403 embody the principles underlying the collateral fact rule. We conclude, therefore, that the collateral fact rule remains viable through Rules 402 and 403.

> As with any type of proof, admissibility of extrinsic evidence depends on relevancy. Impeachment by extrinsic evidence as contemplated by Rule 613 must

relate to facts relevant to a material issue at trial. Allowing the introduction of extrinsic evidence for the purpose of contradicting a witness's testimony about merely trivial facts would not only waste time but could also confuse the jury.

State v. Leach, 148 S.W.3d 42, 56 (Tenn. 2004).

The letters with which defense counsel sought to impeach the victim's testimony that she did not have a close relationship with her mother were clearly irrelevant to any issue at trial as well as prejudicial and potentially confusing to the jury. In one, the writer accuses the victim of lying when she told him she liked only him, stating he had heard that she had said she loved the other boy. In the second letter, the writer, who is apparently the object of the first boy's jealousy, tells the victim that, contrary to rumor, he had not drawn a picture of the victim with the words "I want some pussy" written on the picture. We conclude that the trial court properly precluded these letters as irrelevant.

### E. Preclusion of Email

Finally, the defendant contends that the trial court erred by precluding him from using an email to impeach the victim's father's testimony that he believed the victim's allegations. After the victim's father expressed his confidence in the truth of the victim's allegations, defense counsel attempted to show him an email, concerning the victim's sister, which his wife had sent to Kerri Walker, the victim's mother. The email, with the subject line "[C.M.'s] PROBLEM" reads as follows:

Kerri-

Scott [the victim's father] and [C.M.] would like you to look into haveing [sic] [C.M.] come to live with you after the trial. [C]all dhs and all. [S]he is mis[e]rable here since she can[']t see you on a daily basis and she is making everyone[']s life hard especially hers. Scott is fed up and im [sic] tired of all the fighting between her a[nd] [the victim] and the twins. Let us know what you find out. [W]e figure since nothing actually happened to her there the tramatice [sic] pace is injury isn[']t a problem and if he goes to jail it[']s ok and if he doesn[']t again nothing happened to her.

We find no error in the trial court's ruling that the above email was irrelevant and inadmissible. As the State points out, the victim's father was not the author and the email had nothing to do with his opinion of the victim's credibility or of the defendant's guilt.

### CONCLUSION

Based on our review, we affirm the defendant's rape convictions but reverse the conviction for aggravated sexual battery in Count 3 and remand to the trial court for a new trial on that count. We note that, at the sentencing hearing, the trial court sentenced the defendant to twenty-two years

for each of the rape convictions (Counts 1 and 6) but, at the hearing on the motion for a new trial, reduced those sentences to twenty years and directed the State to prepare amended judgments. However, the amended judgment entered in Count 1 still reflects the defendant's sentence as twenty-two years, and it does not appear that an amended judgment was entered in Count 6. Accordingly, we remand for entry of corrected judgments in Counts 1 and 6 to reflect that the defendant's sentence in each of those counts is twenty years, rather than twenty-two. In all other aspects, the judgments in Counts 1 and 6 are affirmed.

_____
ALAN E. GLENN, JUDGE

-23-